

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:15-CR-143-GBL |
| | ) | |
| JAMES MICHAEL RAMA, | ) | 18 U.S.C. § 371 (Conspiracy) |
| | ) | |
| Defendant. | ) | |

### CRIMINAL INFORMATION

The United States charges:

### COUNT ONE
(Conspiracy to Violate the Foreign Corrupt Practices Act)

At all times relevant to this Information, unless otherwise specified:

*The Foreign Corrupt Practices Act*

1. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* (the "FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

*Kuwait Security Program*

2. The Kuwait Security Program ("KSP") was a homeland security project in Kuwait that was started in or about 2004 by Kuwait's Ministry of the Interior ("MOI"). The KSP was intended to provide nationwide surveillance for several Kuwaiti government agencies,

primarily through the use of closed-circuit television cameras. Its implementation was divided into two parts. The first part, a planning and feasibility period, was referred to as "Phase I" of the KSP. The second part, when the equipment, methods, and programs recommended during Phase I would be installed, was referred to as "Phase II." Revenues from the Phase II contract were expected to be substantially greater than revenues from the Phase I contract. The MOI was responsible for overseeing and implementing the KSP.

### *Defendant and Relevant Entities*

3. IAP Worldwide Services, Inc. ("IAP") was a Delaware corporation headquartered in Cape Canaveral, Florida, that provided facilities management, contingency operations, and professional and technical services in contracting capacities to the U.S. military and civilian agencies. IAP operated in the United States and in various foreign countries, including Kuwait and Iraq. IAP maintained a large office in Arlington, Virginia, in the Eastern District of Virginia, and was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

4. Defendant James Michael Rama ("defendant" or "Rama") was a United States citizen and resident of Maryland. Between in or about August 2005 and in or about March 2007, defendant was IAP's Vice President of Special Projects and Programs. After March 2007, defendant worked as a consultant for IAP. While at IAP, defendant worked at IAP's offices in Cape Canaveral, Florida and Arlington, Virginia, and at offices in Kuwait. Defendant was a United States citizen and therefore was a "domestic concern" and an employee and agent of a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A) and (B).

5. Ramaco International Consulting, LLC ("Ramaco") was a Delaware corporation headquartered in Odenton, Maryland. Ramaco was formed by employees of IAP, including defendant, in February 2006 to bid on the Phase I contract for the KSP. Ramaco was created, among other reasons, to hide IAP's involvement in the KSP bidding and contracting processes. Ramaco was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

6. G3 Systems, Ltd. ("G3") was a defense contracting company headquartered in the United Kingdom. G3 provided support services and security consulting to companies and foreign governments. In or about March 2006, IAP acquired G3. After that acquisition, G3's personnel worked on planning and implementing Phase I of the KSP, and employees at G3 reported to IAP employees with respect to the Phase I contract.

### *Kuwaiti Entities*

7. The State of Kuwait is a sovereign Middle Eastern nation. The national currency in Kuwait is the Kuwaiti Dinar ("KD").

8. Kuwait's Ministry of the Interior ("MOI") is a governmental body of the State of Kuwait and is represented in the chief executive body known as the Cabinet of Kuwait. The MOI's responsibilities include public security, and the MOI oversaw the KSP.

9. "Kuwaiti Consultant" was a citizen of Kuwait. Kuwaiti Consultant was a liaison with the Kuwaiti MOI for the KSP and the individual who paid bribes to Kuwaiti government officials on behalf of IAP and Ramaco.

10. "Kuwaiti Company" was a general trading company formed under the laws of Kuwait. IAP used Kuwaiti Company to, among other activities, funnel bribes to Kuwaiti

3

government officials through Kuwaiti Consultant. Kuwaiti Company was an agent of IAP and Ramaco.

### *Overview of the Conspiracy*

11. In or about August 2004, while employed in Kuwait by a large American company not affiliated with IAP, defendant was introduced to Kuwaiti Consultant. During a meeting with Kuwaiti Consultant, defendant learned that the Kuwaiti MOI was planning to build a large-scale homeland security system called the KSP.

12. In or about 2005, Defendant joined IAP and began pursuing the contract for KSP Phase I with the ultimate goal of obtaining the much more lucrative Phase II contract. Defendant determined that if IAP worked as the MOI's consultant in Phase I, it could tailor the requirements for the Phase II contract to IAP's strengths and thereby give IAP an advantage in the Phase II bidding process.

13. In or about November 2005, defendant received indications that the MOI would select IAP for the Phase I contract, although the formal bidding process had not yet begun. In February 2006, defendant and others agreed to and did set up Ramaco as a shell company to "bid" on Phase I. One purpose of setting up Ramaco was to allow IAP to hide its involvement in Phase I and participate in the later Phase II without any apparent conflict of interest. Defendant became Ramaco's owner and only employee. Ramaco began acting as the agent for IAP on the KSP.

14. In May 2006, defendant, on behalf of Ramaco, signed the KSP Phase I contract with the Government of Kuwait, which had an inflated value of approximately $4 million. In June 2006, defendant, on behalf of Ramaco, signed a master services agreement with IAP requiring IAP to perform work on Phase I of the KSP. Because IAP performed almost all of the

work on Phase I, Ramaco paid IAP almost all of the money that it received from the Kuwaiti government for actual work being completed on Phase I. Before Ramaco entered into the Phase I contract with the Kuwaiti government, defendant and others agreed that IAP would pay a significant share of the Phase I contract that IAP received from the Kuwaiti government to Kuwaiti Consultant.

15. Defendant, with the help of others, structured a payment scheme to funnel approximately 50% of the payments received on the Phase I contract to Kuwaiti Consultant so that he could pay bribes to Kuwaiti government officials and took numerous steps to hide these payments from certain individuals and prevent the detection of their scheme.

16. From September 2006 to June 2008, defendant and IAP authorized repeated payments to Kuwaiti Consultant on the understanding that IAP was bribing Kuwaiti government officials in order to secure (1) Ramaco's continued participation in Phase I, (2) timely payments for Phase I, and (3) IAP's ability to participate in Phase II.

*Statutory Allegations*

17. From in or around 2005, and continuing through in or around 2008, in the Eastern District of Virginia and elsewhere, the defendant did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate, and agree with IAP, Ramaco, Kuwaiti Consultant, and others known and unknown, to commit offenses against the United States, that is, being a domestic concern and an employee and agent of IAP, a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of

5

value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist IAP and Ramaco in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Sections 78dd-2(a).

### *Purpose and Object of the Conspiracy*

18. The purpose and object of the conspiracy was to make corrupt payments to Kuwaiti government officials to obtain and retain business related to the KSP.

### *Manner and Means of the Conspiracy*

19. The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy, while in the Eastern District of Virginia and elsewhere, included the following:

    a. Defendant and his co-conspirators would and did agree to establish Ramaco as a shell company to bid on the Phase I consultancy contract for the KSP and conceal IAP's role in Phase I so that IAP could preserve its ability to bid on the more lucrative Phase II contract.

    b. Defendant and his co-conspirators would and did agree to pay and authorize the payment of bribes to government officials in Kuwait to assist IAP in obtaining and retaining the Phase I consultancy contract and in obtaining the Phase II implementation contract of the KSP.

c. Defendant and his co-conspirators would and did agree that IAP would pay Kuwaiti Consultant a significant amount of the revenues from the KSP Phase I contract, which Kuwaiti Consultant would use, in whole or in part, to bribe Kuwaiti government officials, by funneling payments through Kuwaiti Company.

d. Defendant and his co-conspirators would and did conceal and attempt to conceal the payments to foreign officials by setting up a payment structure through multiple intermediaries and, in doing so, concealed the payments to Kuwaiti Consultant.

e. Defendant and his co-conspirators would and did execute wire transfers and cause wire transfers to be executed for the purpose of paying bribes to foreign officials.

f. Defendant and his co-conspirators would and did pay cash payments and cause cash payments to be paid for the purpose of making payments to foreign officials.

g. Defendant and his co-conspirators would and did write checks and cause checks to be written for the purpose of making bribe payments to foreign officials.

### *Overt Acts*

20. In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed in the Eastern District of Virginia and elsewhere at least one of the following overt acts, among others.

a. In or about November 2005, defendant and Kuwaiti Consultant discussed, in substance and in part, obtaining the KSP Phase I contract and agreed IAP would transfer a substantial share of the Phase I revenues to Kuwaiti Consultant.

b. In or about April 2006, defendant opened a bank account in Kuwait for Ramaco that would be used, in part, to pay IAP as Ramaco's purported subcontractor so that IAP could pay inflated invoices that included money for Kuwaiti Consultant to make bribe payments.

      c.      On or about May 10, 2006, defendant signed the KSP Phase I contract between Ramaco and the government of Kuwait, which included a significant markup of money that would be paid, in whole or in part, to government officials through Kuwaiti Consultant.

      d.      On or about September 13, 2006, after the MOI made its first payment to Ramaco for the KSP Phase I contract via a check for Kuwaiti Dinar (KD) 240,000 (approximately $840,000), defendant thereafter deposited the check in Ramaco's bank account in Kuwait and approved the wiring of this money from that account to IAP's bank account.

      e.      On or about September 13, 2006, a co-conspirator emailed several people, including defendant, and related that he would soon approve IAP's paying Kuwaiti Company KD 120,000 (approximately $420,000) based on invoices that Kuwaiti Company had sent to IAP.

      f.      On or about September 19, 2006, defendant caused IAP to wire KD 120,000 (approximately $420,000) from its bank account to Kuwaiti Company's bank account, and, on or about that same day, Kuwaiti Company paid Kuwaiti Consultant KD 120,000 (approximately $420,000).

      g.      On or about September 19, 2006, defendant requested that the owner of Kuwaiti Company loan to Ramaco a sum of KD 60,000 (approximately $210,000) so that Ramaco could pay Kuwaiti Consultant immediately.

      h.      In or about October 2006, defendant met with employees of IAP and G3 at IAP's office in Arlington, Virginia, which is in the Eastern District of Virginia, in an effort to persuade IAP to continue making payments to Kuwaiti Consultant.

    i.  On or about March 22, 2007, a co-conspirator forwarded to two senior employees of IAP an email message with the subject line "KSP Update" after a co-conspirator deleted part of the email that referred to Kuwaiti Consultant.

    j.  In or about April 2007, a co-conspirator gave instructions to an employee of IAP to delete references to Kuwaiti Consultant and to never circulate documents indicating the involvement of Kuwaiti Consultant.

    k.  On or about June 5, 2007, a co-conspirator authorized the transfer of KD 29,962.27 (approximately $105,000) from an IAP bank account in the United States to Kuwaiti Company's bank account in Kuwait, and on or about June 13, 2007, IAP wired KD 29,962.27 from its bank account in the United States to Kuwaiti Company's bank account so that Kuwaiti Company could pay Kuwaiti Consultant.

    l.  On or about September 24, 2007, defendant wrote a letter to the MOI detailing the work that had been completed on Phase I of the KSP but not disclosing the diversion of Phase I revenues to Kuwaiti Consultant.

    m.  On or about October 28, 2007, defendant and Kuwaiti Consultant discussed, in substance and in part, the status of the KSP including how to obtain the lucrative Phase II contract.

    n.  On or about November 13, 2007, defendant traveled from Dulles International Airport in the Eastern District of Virginia to Kuwait to meet with members of the MOI as part of IAP's and Ramaco's efforts to retain the KSP Phase I contract and to win the KSP Phase II contract.

o. On or about December 6, 2007, after Ramaco transferred KD 52,250 (approximately $183,000) to a co-conspirator, that co-conspirator gave Kuwaiti Consultant that amount in cash.

p. On or about March 10, 2008, after Ramaco paid a co-conspirator a check in the amount of KD 44,250 (approximately $155,000), the co-conspirator gave Kuwaiti Consultant that amount in cash.

(All in violation of Title 18, United States Code, Section 371.)

ANDREW WEISSMANN
CHIEF, FRAUD SECTION
Criminal Division
United States Department of Justice

DANA J. BOENTE
UNITED STATES ATTORNEY

_____
Tarek Helou
Assistant Chief
James P. McDonald
Trial Attorney
Fraud Section, Criminal Division
1400 New York Avenue, N.W.
Washington, DC 20530
Phone: (202) 514-7023/598-2441
Fax: (202) 616-3511
tarek.helou@usdoj.gov
james.mcdonald@usdoj.gov

_____
Paul J. Nathanson
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
paul.nathanson@usdoj.gov